## THE TRANSFER NO. 12.

### (District Court, D. New Jersey. May 5, 1911.)

COLLISION (§ 96*)—STEAMER PASSING OUT FROM SLIP—NAVIGATING TOO NEAR ENDS OF PIERS.

A transfer tug, passing downstream at a high speed at night within 30 feet or so of the end of a coal pier at Jersey City having a shed its full length, *held* solely in fault for a collision with a steamer coming out from the slip on the south side of the pier, and which gave the usual slip whistle.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 203–205; Dec. Dig. § 96.*]

In Admiralty. Suit by the Jersey City Stockyards Company, as owner of the steamer Burlington, against the steamtug Transfer No. 12. Decree for libelant.

Bedle & Kellogg, for libelant.
Vredenburgh, Wall & Carey, for respondent.

CROSS, District Judge. The libelant filed its libel herein to recover damages for injuries which the steamboat Burlington, owned by it, sustained in a collision with Transfer No. 12, which happened, as claimed, through the negligent management of that boat. The collision occurred about half past 8 o'clock in the evening of March 31, 1909, when the Burlington was just off the end of a pier known as the "Communipaw coal pier," at Jersey City, within this district. Between that pier and the Port Liberty pier, just south of it, there is open water constituting a slip of about 250 feet in width. The Burlington had just finished coaling at the south side of the Communipaw pier, and passed out of the slip when the collision occurred. The respondent was proceeding southerly for the purpose of coaling at the Port Liberty pier, which is, as above stated, on the southerly side of the same slip. The evening, although not stormy, was dark at the time of the collision.

There was but little wind blowing, and the tide was at the ebb. The Burlington was in charge of a crew of five, a captain, engineer, fireman, and two deckhands. She was a double-ended side-wheeled ferryboat, 165 feet long, of 53 feet beam, drew about 6 feet of water,

and was capable of making about 7 miles an hour. Transfer No. 12 had a similar crew. She was a propeller tugboat, 110 feet long, of 22 feet beam, drew 13 feet of water, and was capable of making about 14 miles an hour. The Communipaw coal dock has coal sheds built overhead throughout its entire length, and which are so high as to cut off from the view of a boat coming from the north the Burlington or any similar boat lying at or passing along the south side of the pier. The Burlington, while being coaled, lay from one to two of her lengths from the end of the pier on its southerly side; that is, the side opposite that from which Transfer No. 12 was approaching. The testimony of her captain and crew is that when she was fully coaled a short whistle was blown as a signal to cast off her lines. This operation took only a minute or so. Immediately thereafter a long slip whistle was blown, which continued while she moved out towards, and until she had reached, the end of the pier. The crew of Transfer No. 12 all say, however, that they heard no whistle, and they are, to a slight extent, corroborated by a witness who at the time was on the Port Liberty pier, and who said that he heard no whistle blown by the Burlington; but he immediately afterwards admitted that she did blow a short whistle as a signal to cast off the lines.

Under the circumstances, it is obvious that his testimony is not very satisfactory or reliable. The positive evidence that a long slip whistle was blown cannot be overcome by negative evidence that it was not heard. Moreover, the probabilities are altogether in favor of the view that it was blown. It would be so monumental and dangerous an exhibition of negligence for a captain to come out from behind a high overshadowing pier directly into navigable waters, without giving any signal, as of itself to be almost unbelievable. The captain of the Burlington says he was abreast of the end of the pier when Transfer No. 12 was coming toward him at a high rate of speed, about 30 feet off the end of the pier and but 300 or 400 feet north of it. In this he is corroborated. Further, the stern of the Burlington was, as he testified, only 30 feet from the end of the pier when she was struck on her port bow while advancing at a rate of but 2 or 3 miles an hour. The force of the blow made a gash in her 10 or 12 feet deep and forced her back into the slip.

The testimony on the part of the respondent is that Transfer No. 12 was merely drifting at the time of the collision, and that the Burlington ran into her; but I cannot accept this view of the case. It is manifest, from the circumstances outside of the direct testimony, that she, having just come out of the slip, could not have attained any considerable speed, and the result of the collision would seem to show conclusively which boat gave the blow. The tug was uninjured. Moreover, it appears by the respondent's own testimony that Transfer No. 12 occupied but five minutes in coming from the Lehigh Valley docks, which are located 2,000 feet above the Communipaw dock. In my judgment the collision was caused by the fact that Transfer No. 12, in proceeding to her coaling place at the Port Liberty dock, cut across close to the end of the Communipaw pier.

This in itself showed negligence. She had 400 or 500 feet of clear water, and should have kept farther out in the channel until opposite the slip, and then have rounded into it. Had this been done, there would have been no collision, nor any opportunity for one. Her captain knew of the existence of the Communipaw pier, and that boats were accustomed to coal on both sides of it. He also must have known that her lookout, coming as she was from the north, could not see, even in the daytime, a boat lying on the south side of the pier. That the danger was recognized appears from a clause in the respondent's answer as follows:

"A careful lookout was kept in order to avoid a collision between the said tug Transfer No. 12 and such boat or boats as might be about to leave from the Communipaw coal piers, or any of them."

Again, the captain of Transfer No. 12 testified as follows:

"Q. Would you have shaped your course in the same way as you were going if you had heard the long whistle of the Burlington? A. I would have kept farther out from the docks, and also I might have backed sooner."

This admission of itself shows that he acted imprudently. He had no right to assume, from the fact that he heard no whistle, or that the lookout had failed to see and warn him of what it was impossible to see, that there was no boat lying behind, or moving out from behind, the pier. He manifestly took an unwarranted risk. He also admits that he was but 200 to 300 feet from the down stream (south) side of the Communipaw dock when he blew his first whistle for the Burlington.

The libelant's case may well be rested upon what has already been stated; but, aside from that, according to the evidence, Transfer No. 12 was at the time showing only her green starboard light, while the Burlington had all her lights up, as required by law. It is unnecessary to consider the question of signals. Those given by Transfer No. 12 were promptly answered by the Burlington, and the maneuvers indicated attempted. All of the signals, however, were given within a few seconds of the collision. This must have been the case, apart from the direct evidence, in view of the fact that the respondent was, as already indicated, but a short distance away when the Burlington was sighted. That the respondent was solely in fault clearly appears.

A reference will be made to a commissioner to ascertain and report libelant's damages.